```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ALABAMA
                          SOUTHERN DIVISION

TERRILL W. SANDERS, as        )
administrator of the estate   )
of MORIE DELL HUBBARD, JR.,   )
                              )
     Plaintiff,               )
                              )
v.                            )    CV96-H-20-S
                              )
BIRMINGHAM BOARD OF EDUCATION,)
                              )
     Defendant.               )
```

FILED
97 JUN 17 PM 4:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUN 17 1997

## MEMORANDUM OF DECISION

Presently before the Court is the March 31, 1997 motion for summary judgment filed by defendant, the Birmingham Board of Education. Pursuant to Orders dated April 1, 1997, May 7, 1997, and May 28, 1997, the motion was deemed submitted, without oral argument, on June 9, 1997.

### I. Procedural History

Plaintiff commenced this action on December 5, 1995 by filing a six-count complaint in the Circuit Court for Jefferson County, Alabama. The complaint asserted claims of race and age discrimination, retaliation, breach of contract, and outrage.

Defendant filed a notice of removal on January 4, 1996, asserting federal question jurisdiction, since plaintiff's claims were based on Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and 42 U.S.C. § 1983.

45

Plaintiff Morie Hubbard died on February 7, 1996, and Terrill Sanders, Administrator of Hubbard's estate, was substituted as plaintiff by an Order dated June 11, 1996.[1]

Defendant filed the present motion for summary judgment on March 31, 1997. In support of the motion, defendant has filed a principal brief and a reply brief, an evidentiary submission consisting of 27 exhibits, and the supplemental affidavit of Willie Burkhalter. In opposition to the motion, plaintiff filed a principal and reply brief, an evidentiary submission containing 15 exhibits, and the supplemental affidavit of Homer Mims, as well as the supplemental affidavit of Reddrick Blair.

## II. Standards for Evaluating a Summary Judgment Motion

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the jury by means of summary judgment. Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1384 (11th Cir. 1996). However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . .are not rare in employment discrimination cases." Earley v. Champion International Corp., 907 F.2d 1077, 1080. "Summary judgment procedure is properly

---

[1] Notwithstanding this substitution, the Court will use the term "plaintiff" to refer to Morie Hubbard throughout this Memorandum.

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit encourages district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir. 1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the shifting-burden framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[2]  Second,

---

[2] In order to present a prima facie case of discrimination, plaintiff must show:  (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802.  Based on O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

3

after plaintiff has presented a <u>prima facie</u> case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." <u>Brown v. American Honda Motor Co., Inc.</u>, 939 F.2d 946, 950 (11th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1058 (1992) (quoting <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated against the plaintiff. <u>McDonnell Douglas</u>, 411 U.S. at 804. In other words, "[a]fter a Title VII plaintiff makes out a prima facie case, and the defendant produces a legitimate nondiscriminatory explanation for its actions, the McDonnell-Burdine presumption drops from the case. "At that point, the inquiry is whether the defendant intentionally discriminated against the plaintiff." <u>Harris v. Shelby County Board of Education</u>, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly

4

probative' evidence on the issue to avoid summary judgment." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy or credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." Brown, 939 F.2d at 950. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for

5

its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d at 830).

### III. Relevant Undisputed Facts

Plaintiff began his employment for the Birmingham Board of Education ("the Board") in 1964, as a janitor. (Hubbard Depo. at 13-14). Eventually, plaintiff was transferred to the Board's Grounds Department, and held the title of maintenance helper, grade 7. (Id. at 19-20). In that position, plaintiff was under the supervision of Alvin Reid, the Grounds Department foreman. (Id. at 25).

Plaintiff applied for a promotion to a grade 9 maintenance helper in 1991, and was denied the promotion. (Plaintiff's Ev. Submission, Ex. 11). Plaintiff filed an EEOC charge and a lawsuit against the Board, alleging race and age discrimination. (Id.; Complaint in CV92-B-889-S). In April 1993, plaintiff and the Board agreed to a settlement of the claims in plaintiff's 1992 lawsuit; the Board agreed to promote plaintiff to a grade 10 maintenance helper, and gave plaintiff $5,000. (Defendant's Ev. Submission, Ex. 2). The settlement agreement included a written description of the duties of a grade 10 maintenance helper, and added that "[t]he parties expressly state their understanding that the written position description is subject to change by the Board at any time, and that Hubbard may be assigned to different

6

or additional duties at any time, according to the needs and staffing of the Grounds Department." (Id. at 2). Since plaintiff was born in 1933, plaintiff was approximately 60 years of age at the time of the settlement.

Plaintiff was promoted according to the settlement agreement, and was given the grade 10 maintenance helper position that had previously been held by Keith Dean, a white, younger man. (Reid Depo. at 70-71).

The duties of a grade 10 maintenance helper are nearly identical to those of lower-grade maintenance helpers. All grades of maintenance helpers are responsible for doing "anything that comes up" needed to maintain the Board's schools and grounds. (Reid Depo. at 72). See also Reid Aff.; Howell Aff.; Nunn Aff. Grade 10 maintenance helpers, like lower grade helpers, are responsible for riding and operating a tractor that pulls a "bush hog" behind it to cut grass at various Board schools. (Howell 2/4/97 Depo. at 16-19, 21). Grade 10 helpers are also required to operate other pieces of heavy machinery, such as a crane truck, asphalt spreader, and asphalt roller. (Id. at 16). Finally, on occasion, a grade 10 employee will work alongside and direct a crew of lower-grade helpers in some task, such as moving furniture or books, or trimming trees. (Burkhalter Depo. at 44-45).

Pursuant to this general job description, Keith Dean, the young, white man who had previously been a grade 10 maintenance

7

helper, cut trees and shrubs with a chain saw and cut grass with a weed eater. (Howell 2/4/97 Depo. at 47-48; Reid Depo. at 54-55). Dean also was required to operate a tractor and bush hog. (Armstrong Depo. at 54). Finally, Dean participated in the moving and accounting of furniture during several school renovations. (Reid Depo. at 54).[3] However, Dean also frequently performed supervisory functions, such as directing other Grounds Department employees. (Blair Aff.).

When plaintiff was promoted to a grade 10 helper, his supervisor, Alvin Reid, did not believe that he was entitled to the promotion. (Reid Depo. at 33).[4] According to Reid, plaintiff had previously been assigned to supervise crews of other maintenance helpers, and Reid had received complaints from those helpers that plaintiff would simply stand by and supervise, rather than helping in the work. (Reid Depo. at 33, 37).[5] In addition, immediately after plaintiff's promotion, Reid and some other employees attempted to instruct plaintiff on the safe

---

[3] A different description of Dean's duties comes from the affidavits of Homer Mims and Roy Bailey. The Court will address these two affidavits below.

[4] It is undisputed that Reid was the same age as plaintiff. (Reid Aff.).

[5] Reddrick Blair, in his affidavit, asserts that he never heard any complaints about plaintiff's work ethic. This assertion does not, however, bring into dispute the fact that some Grounds Department employees had complained to Reid about plaintiff's willingness to work. Simply because Blair did not hear any complaints does not mean that no complaints were made to Reid.

8

operation of the crane truck. (Reid Aff.). Operating the crane truck involved lifting heavy objects in close proximity to other workers, and so safety was a primary concern. (Id.). While Reid was attempting to train plaintiff to operate the crane truck, plaintiff was either unable or unwilling to learn to operate it safely, and almost had a serious accident that could have injured another employee. (Reid Depo. at 35-36; Reid Aff.). Two employees who observed plaintiff operating the crane truck were not comfortable with plaintiff's ability to safely operate the truck, and told Reid that they were unwilling to work with plaintiff in that capacity. (Nunn Aff.; Bell Aff.). As a result, Reid never assigned plaintiff to operate the crane truck again, although operation of the truck was one of the written requirements of the grade 10 helper position. (Reid Aff.; Reid Depo. at 35-36).[6]

Because Reid believed that plaintiff could not be assigned to supervise other workers, and because plaintiff could not safely operate the crane truck, plaintiff was routinely assigned to work alone. (Reid Depo. at 61). It is undisputed that one of the primary tasks assigned to plaintiff was operating a tractor

---

[6] In his affidavit, Reddrick Blair asserts that he saw plaintiff operating the crane truck on two or three occasions, and that plaintiff "was doing a good job." That same affidavit asserts that Blair never heard any complaints about plaintiff's ability to operate the truck. However, Blair's affidavit does not bring into dispute the fact that two employees did complain to Reid about plaintiff's proficiency in operating the crane truck.

9

and bush hog to cut grass at various schools during summer months. (<u>Id.</u> at 61-62). In addition to plaintiff, three other individuals (all grade 9 maintenance helpers) were required to operate tractors to cut grass: Leverd Nunn (a 36-year-old black man), Wilson Bell (a 39-year-old white male), and Anthony Taylor (a black male). (Nunn Aff.; Bell Aff.). Due to the great need to maintain the lawns at the Board's schools, Reid would typically assign all four of these individuals to work cutting grass simultaneously. (Reid Depo. at 61). None of these tractors was equipped with a cover, and all four men who operated the tractors were exposed to the summer sun while riding the tractors. (Nunn Aff.).

In addition to cutting grass, plaintiff was required to do other physical work, such as moving books, cutting trees and bushes with a chain saw, operating an asphalt roller, and shoveling asphalt. (Bailey Aff.; Mims Aff.; Blair Aff.). After plaintiff suffered a heart attack in 1995, he took a leave of absence from work, and returned to duty thereafter operating a truck. (Mims Aff.; Bailey Aff.; Jackson Aff.).[7] In this capacity, plaintiff was given more supervisory responsibility and was no longer required to cut grass. (Jackson Aff.).

---

[7]Reddrick Blair's affidavit contradicts two other affidavits submitted by plaintiff by asserting that plaintiff was not actually assigned to light duty. This factual dispute between plaintiff's affiants, however, is not relevant to the resolution of the motion for summary judgment.

10

Plaintiff died of a heart attack in February 1996. (Plaintiff's Death Certificate). The cause of death was identified as "coronary artery disease," and the doctor who completed the death certificate indicated that plaintiff had suffered from coronary disease for "years." (Id.).[8]

---

[8]The Court feels compelled to comment on a "fact" that plaintiff's counsel asserts throughout the briefs: that plaintiff's death was a consequence of his work assignments. Typical of the melodrama found in plaintiff's brief is the following passage:
> By forcing the plaintiff, an elderly gentlemen [sic] who had dedicated over forty (40) years to defendant, to perform those tasks that Mr. Reid required him to perform, the defendant effectively killed the plaintiff. * * * On February 7, 1996, Mr. Reid succeeded in obtaining the ultimate punishment for plaintiff. On that date, after having already suffered one heart attack in 1995, the plaintiff suffered a massive heart attack and died. The defendant certainly made its point that complaints of race and age discrimination will not be tolerated.

The theme that plaintiff's heart problems were caused or exacerbated by riding a tractor in the sun pervades plaintiff's brief, but plaintiff has not even attempted to offer any medical evidence linking plaintiff's sun exposure to his death. Given this lack of evidence, it is utterly irresponsible and unprofessional for plaintiff's counsel to indulge themselves in the hyperbole of asserting that plaintiff's working conditions caused his death, let alone that defendant intentionally killed plaintiff. It serves no legitimate purpose for attorneys to engage in such reckless accusations.

11

IV. Analysis

A. Retaliation and race and age discrimination claims

Plaintiff's primary claim in this action is that Alvin Reid assigned him to hard physical work and deprived him of supervisory responsibilities for some improper reason. Plaintiff contends that Reid discriminated against him with respect to job assignments either because of retaliation for plaintiff's prior lawsuit against the Board, or because of plaintiff's age, or because of plaintiff's race. In making this claim of disparate treatment, plaintiff compares himself to Keith Dean, his class 10 predecessor. Plaintiff asserts that Dean was treated differently by being assigned non-strenuous, supervisory duties, while plaintiff was deprived of supervisory responsibility and given strenuous work. Since Dean was younger than plaintiff, white, and had not filed a discrimination lawsuit against the Board, plaintiff asserts that this comparison supports an inference of discrimination.

In order to show the different treatment allegedly accorded Dean, plaintiff relies on the affidavits of two individuals plaintiff identifies as "co-workers": Roy Bailey and Homer Mims. These men, however, were not plaintiff's co-workers; Bailey was employed in the Board's Carpentry Department, and Mims was employed as a painter. (Bailey Aff.; Mims Aff.). Despite the

12

fact that each of these men worked in a different department from plaintiff (and from each other), they have signed identical affidavits asserting that they "routinely" observed both plaintiff and Dean performing their job duties. Bailey and Mims assert that Dean never did any physical work, but instead walked around with a clipboard and supervised other workers. (Id.).

However, plaintiff cannot rely on Mims and Bailey to establish what Dean's job responsibilities were, because the undisputed evidence in the record shows that neither Mims nor Bailey could have personal knowledge of what Dean did on a day-to-day basis. Mims and Bailey assert that they had the opportunity to observe Dean and plaintiff, because the Board's Grounds Department employees worked out of the same Service Center building that Mims and Bailey were based in. However, it is also undisputed that both Dean and plaintiff were required to perform most (if not all) of their work away from that building -- maintaining the various schools operated by the Board. (Howell Depo. at 21). Although Mims and Bailey may not have seen Dean performing any physical work, it is undisputed that Dean did so on various school campuses, away from the Service Center building where Mims and Bailey might have seen him. See Howell 2/4/97 Depo. at 47-48 (Dean cut grass and trees); Armstrong Depo. at 54 (Dean operated a tractor and bush hog); Reid Depo. at 71-72 (Dean did "anything that come along").

Because Mims and Bailey did not, as a matter of undisputed

13

fact, observe either plaintiff or Dean except at the Board's Service Center building, they do not have the personal knowledge to exhaustively detail what Dean and plaintiff did on a day-to-day basis.  The fact that Mims and Bailey occasionally observed plaintiff doing physical work and never saw Dean doing similar work around the Service Center building does not call into dispute the fact that Dean, in fact, did physical work identical to that performed by plaintiff.

However, Reid testified at his deposition that he did refrain from assigning plaintiff certain duties normally assigned to a grade 10 helper.  In particular, Reid testified that he assigned plaintiff to work alone, rather than supervising other employees, and refused to assign plaintiff to operate the crane truck.  So, the Court accepts, as undisputed fact, that Dean enjoyed more supervisory responsibilities than plaintiff.  In accepting this disparity in treatment between plaintiff and Dean, the Court also accepts the assertion in Reddrick Blair's affidavit that Dean enjoyed more supervisory responsibility and performed less physical labor than plaintiff.

Thus, plaintiff has established a prima facie case that he was treated differently than a similarly-situated employee.  Under McDonnell Douglas, the burden then shifts to defendant to articulate some legitimate, non-discriminatory reason for this different treatment.  Defendant has introduced unrebutted evidence that plaintiff was unable (or unwilling) to operate the

14

crane truck in a safe manner, and that other Board employees refused to work with plaintiff in that capacity.[9] In addition, it is undisputed that Reid, plaintiff's supervisor, had received complaints about plaintiff's performance as a team leader; Reid testified that it was reported to him that plaintiff would simply watch others work, rather than participating in the work, as he was required to do.

These proffered reasons advanced by defendant shift the burden back to plaintiff to produce some evidence that the proffered reasons are false, or that the real reason Reid treated plaintiff differently was because of race, age, or retaliation. Plaintiff has attempted to show that Reid's decision not to assign plaintiff to the crane truck was based on something other than legitimate safety concerns by submitting the affidavit of Reddrick Blair. However, as the Court noted above, neither Blair's assertions that he believed that plaintiff was doing "a good job" with the truck, nor the fact that Blair had not heard any complaints about plaintiff brings into dispute Reid's

---

[9] Again, plaintiff's attempt to create an issue of fact through the affidavit of Reddrick Blair is unavailing. Blair asserts that, in his opinion, plaintiff did "a good job" of operating the crane truck, and that he never heard any complaints about plaintiff's operation of the truck. However, this assertion does not rebut the fact that two Grounds Department employees were so concerned about plaintiff's safe operation of the truck that they refused to work with plaintiff in that capacity. Blair's assertion that he heard no complaints does not call into dispute the fact that such complaints were made to Reid.

15

deposition testimony that, in fact, Reid received complaints from two Grounds Department employees indicating that plaintiff could not operate the crane safely. Those same two employees, as a matter of undisputed fact, refused to work in any work detail in which plaintiff was operating the crane truck. Blair's affidavit does not raise a genuine issue of fact regarding whether Reid acted under pretext by refusing to allow plaintiff to operate the crane truck.

Plaintiff has also attempted to attack Reid's rationale for denying plaintiff supervisory duties. Plaintiff's affiants Mims, Blair, and Bailey assert in their identical affidavits that "I have never heard any complaints by any other employee about Mr. Hubbard's work ethic." (Mims Aff.; Bailey Aff.; Blair Aff.). All three men assert that they have never heard anyone say that plaintiff was unwilling to do his share of the work. (Id.).

The fact that Mims and Bailey have not heard any such complaints, however, is insufficient to create a genuine issue of fact regarding whether complaints were made <u>to Reid</u> about plaintiff's willingness to work. As noted above, it is undisputed that Mims and Bailey did not even work in the same department as plaintiff or Reid, and had very limited opportunity to observe and interact with Grounds Department workers. Blair worked in the Grounds Department until 1993, but the fact that <u>he</u> never heard any complaints about plaintiff's performance does not call into dispute the fact that such complaints were made <u>to</u>

16

Reid, the supervisor to whom such complaints would normally be made. As the record stands, it is undisputed that employees assigned to work under plaintiff complained to Reid about plaintiff's willingness to assist in the work. (Reid Depo. at 37). Reid thus assigned plaintiff to work alone to prevent further problems from developing between plaintiff and lower-grade employees, and to make sure that plaintiff actually performed his duties. There is absolutely nothing in the record to indicate that Reid's reliance on the complaints about plaintiff was pretextual.

In addition, it is undisputed that Reid was the same age as plaintiff, and assigned both black and white, old and young employees to cut grass in the sun. This undisputed evidence affirmatively rebuts any allegation by plaintiff that age, race, or retaliation influenced plaintiff's job assignments.

To conclude, the non-discriminatory reasons for plaintiff's work assignments are supported by unrebutted evidence, and there is nothing in the record to suggest that these reasons were pretextual, or that some unlawful motivation entered into the decisions in question. Given the evidence in the record, the Board is entitled to summary judgment with respect to all of the retaliation and race and age discrimination claims asserted.

B. Breach of contract

Another claim asserted in the complaint is that the Board breached its settlement agreement with plaintiff by refusing to give him work assignments appropriate to a grade 10 employee. This claim is frivolous. Not only is it undisputed that all of the duties assigned to plaintiff were within the job description of a grade 10 maintenance helper, and that Keith Dean performed similar duties (although to a lesser extent), but in addition the settlement agreement itself provides that "[t]he parties hereto expressly state their understanding that the written position description is subject to change at any time, and that Hubbard may be assigned to different or additional duties at any time, according to the needs and staffing of the Grounds Department." It is further undisputed that plaintiff, in fact, received the title and pay of a grade 10 maintenance helper. The settlement agreement gave plaintiff no right to any particular job responsibilities, and the Board committed no breach by denying plaintiff a supervisory role. Defendant is entitled to summary judgment with respect to plaintiff's breach of contract claim.

C. Outrage

The final claim asserted in the complaint is that the Board is liable under Alabama's tort of outrage for its treatment of

plaintiff.  Plaintiff's outrage claim is premised on the theory that the Board committed outrageous conduct by requiring plaintiff to ride a tractor in the sun, operate a chain saw, and other physical duties.  The discussion of the outrage issue in plaintiff's brief again emphasizes that these work assignments caused plaintiff's death, thereby rendering the conduct "atrocious and beyond all possible bounds of decency."

As noted above, there is no evidence in the record to suggest that plaintiff's death was caused by exposure to the sun while riding a tractor, or by any other job assignment he received.  Plaintiff's claim must rise or fall solely on the basis that it was "atrocious and utterly intolerable" for defendant to require plaintiff to perform the tasks assigned him, such as operating a tractor in the sun.

Historically, the Alabama Supreme Court has restricted recovery under the tort of outrage to three areas: (1) the mishandling of family burials; (2) a case in which insurance agents used "barbaric" methods in an attempt to coerce an insured into settling an insurance claim; and (3) egregious sexual harassment.  See Ex parte Crawford & Co., 1997 WL 112719, at *3 n.1 (Ala. March 14, 1997); Thomas v. BSE Industrial Contractors, 624 So. 2d 1041, 1044 (Ala. 1993).

Against the backdrop of the Alabama Supreme Court's conservative handling of the tort of outrage, it is apparent that the conduct alleged here does not rise to the level of "atrocious

and utterly intolerable in a civilized society." The undisputed evidence is that it was within plaintiff's job description to do physical work to maintain the Board's schools. In addition, it is undisputed that plaintiff never complained to any supervisor about his work assignments or conditions. (Reid Aff.). Plaintiff simply cannot point to any evidence in the record that could create a jury issue of outrage, and summary judgment is appropriate with respect to this claim.

For the foregoing reasons, the Court concludes that defendant's motion for summary judgment is due to be granted with respect to all claims raised in the complaint. A separate Final Order and Judgment will be entered accordingly.

DONE this 17th day of June, 1997.

*James W. Hancock*
SENIOR UNITED STATES DISTRICT JUDGE

20